# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | |
| | : | **Criminal No. 92-cr-345 (RC)** |
| **ANDRE P. BROWN,** | : | |
| | : | |
| **Defendant.** | : | |

## GOVERNMENT'S OPPOSITION TO DEFENDANT'S MOTION FOR COMPASSIONATE RELEASE

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this Opposition to defendant Andre P. Brown's "Motion for Compassionate Release Pursuant to D.C. Code § 24-403d" ("Motion") (ECF No. 87), and his "Supplemental Memorandum of Points and Authorities" in support of his Motion ("Supp. Mem."), in which he also seeks relief pursuant to 18 U.S.C. § 3582(c)(1)(A)(i) (ECF No. 89). Defendant asks the Court to reduce his sentence of imprisonment, and order his immediate release, relying in part on the threat posed by the COVID-19 pandemic. The United States respectfully opposes the motion. Pursuant to the federal compassionate release statute, this Court should deny the motion without prejudice for defendant's failure to exhaust administrative remedies. Should the Court reach the merits of defendant's claim for relief under the federal statute, the Court should deny the motion with prejudice because defendant has not met his burden of establishing that a sentence reduction is warranted under the statute. The Court should deny defendant's claim under the D.C. compassionate release statute because defendant is not eligible for relief under this statute and because, even if he were, his claim fails for the same reasons that his claim under the federal statute fails.

1

# I.     RELEVANT BACKGROUND

**A.     Defendant's Convictions**

An indictment filed on September 10, 1992, charged defendant with possession with intent to distribute more than five grams of cocaine base, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(B)(iii) (Count One); use of a firearm in connection with a drug trafficking offense, in violation of 18 U.S.C. § 924 (c) (Count Two); possession with intent to distribute more than five grams of cocaine base within 1,000 feet of a school, in violation of 21 U.S.C. § 860(a) (Count Three); armed assault on a police officer ("APO while Armed"), in violation of D.C. Code § 22-505(b) (Count Four); and carrying a pistol without a license ("CPWL"), in violation of D.C. Code § 22-3204(a) (Count Five). On December 21, 1992, following a five-day trial before the Honorable Joyce Hens Green, the jury returned guilty verdicts on Counts Four and Five (APO while Armed and CPWL). The following day, the jury reported that it was hopelessly deadlocked on the remaining counts, and the Court declared a mistrial.

On February 2, 1993, defendant filed a motion for a new trial pursuant to Fed. R. Crim. P. 30 in which he alleged that a juror had concealed his law enforcement background on voir dire and, upon later inquiry by the Court, had dishonestly denied the concealment. However, on February 19, 1993, before the new-trial motion was decided, defendant pled guilty to Count Two of the indictment (the violation of § 924(c)) in exchange for the government's agreement to dismiss Counts One and Three. As part of the plea agreement, defendant also withdrew his motion for a new trial.

1.  **The Evidence**[1]

The government's evidence established that on August 12, 1992, Metropolitan Police Department ("MPD") Officer Manuel Suber was assigned to the arrest team of a narcotics detail operating in the environs of Wahler Place, S.E., Washington, D.C. Officer Suber was in full police uniform. At approximately 6:15 p.m., he received a "look out" for a female suspected of having sold illicit drugs to an undercover officer. Officer Suber went to the 1000 block of Wahler Place where he saw the suspect standing on a staircase with defendant. Defendant was holding a transparent plastic bag in his left hand and the female was picking through it. The bag contained 40 to 50 ziplock bags, each of which contained a white rock. Officer Suber approached, and he physically moved the woman to one side. He then asked defendant for the ziplock bags and simultaneously reached for them. Defendant brought up his left hand but, in it, was a .38 caliber revolver. Defendant pointed the gun straight into Officer Suber's face from a distance of about two feet. Officer Suber looked down the barrel of the gun and saw the bullets on either side. Subsequent examination revealed the weapon to be operable, and to be fully loaded with six bullets.

Defendant attempted to cock the hammer of the gun. Officer Suber let go of the plastic bag and snatched the gun barrel, wrenching it out of defendant's hand. Defendant then brought up a second gun. Officer Suber grabbed defendant's gun hand at about stomach level, and he pushed defendant backward into an apartment, all the while shouting, "He's got another gun." Officer Suber then withdrew, broadcasting defendant's location — and the fact that he was armed — to fellow officers converging on the front and the rear of the building.

---

[1]   The following narrative is drawn from the facts described — with citations to the trial record — in the government's appellate brief.

Shortly thereafter, MPD Officer Thomas Fontz, who had taken up a position directly behind the building, heard glass smashing and saw "an explosion of objects [coming] out the window" of the building. After about ten minutes' continuous surveillance, Officer Fontz, covered by other officers, retrieved a plastic bag containing ziplock bags containing white rocks, as well as some loose ziplock bags containing white rocks, from among the glass shards that were littered under the broken window. Shortly thereafter and while still on the scene, Officer Suber identified the plastic bag and its contents as the materials he earlier had seen in defendant's left hand.

Thirty minutes after the assault on Officer Suber, defendant emerged from the apartment under the control of police. Officer Suber immediately identified defendant as his assailant. The evidence also established that defendant did not have a permit to carry a gun on August 12, 1992; the plastic bags retrieved by Officer Fontz and identified by Officer Suber as having been carried by defendant contained 7.144 grams of 91% pure cocaine base; and the distance from the building in which Officer Suber observed defendant holding the plastic bags to Draper Elementary School was 714 feet.

### 2. Sentencing

On June 22, 1993, the Court sentenced defendant to consecutive terms of incarceration of 18 to 54 months on the APO while Armed charge and 60 months (5 years) on the § 924(c) conviction. The Court sentenced defendant to a concurrent term of 3 to 9 months of incarceration on the CPWL conviction.[2] According to United States Parole Commission ("USPC") records, defendant was released from Bureau of Prisons ("BOP") custody to parole on August 26, 1998

---

[2] Defendant appealed from his convictions at trial for APO while Armed and CPWL. He claimed that that he was denied his Sixth Amendment right to an impartial jury because one of his jurors was actually biased. The United States Court of Appeals for the District of Columbia Circuit rejected this claim and affirmed defendant's convictions. *United States v. Brown*, 26 F.3d 1124 (D.C. Cir. 1994).

(with a full term date of June 17, 2001) (Attachment A – Parole Revocation Prehearing Assessment).

**B.      Additional Relevant Background**

On January 10, 2000, defendant's parole officer reported that he was in violation of his parole conditions, specifically noting (1) his arrest on November 5, 1999, in Georgia, where he was charged with financial identity fraud; and (2) his failure to make himself available for drug testing (Attachment B – Memorandum to Board of Parole, January 10, 2000). The parole officer requested that the Board of Parole issue a warrant for defendant's arrest (*id.*). On January 28, 2000, the parole officer advised the Board of Parole of an additional violation: on January 20, 2000, a warrant was issued for defendant's arrest, charging him with the January 17, 2000, shooting of Malika McDaniels (Attachment C – Memorandum to Board of Parole, January 28, 2000). On February 2, 2000, a parole violation warrant was issued for defendant's arrest (Attachment D – Parole Warrant).

Following the January 17, 2000, shooting of Ms. McDaniels, a District of Columbia Superior Court grand jury returned an indictment charging defendant with four counts of assault with intent to kill while armed ("AWIKWA"), in violation of D.C. Code §§ 22-401 and -4502; one count of mayhem while armed, in violation of D.C. Code §§ 22-406 and -4502; one count of aggravated assault while armed, in violation of D.C. Code §§ 22-404.1 and - 4502; six counts of possession of a firearm during a crime of violence ("PFCOV"), in violation of D.C. Code § 22-4504(b); and one count each of CPWL, in violation of D.C. Code § 22-4504(a), possession of an unregistered firearm (UF), in violation of D.C. Code § 7-2502.01, and unlawful possession of ammunition (UA), in violation of D.C. Code § 7-2506.01(3). Defendant fled the jurisdiction after the shooting, and a warrant was issued for his arrest.

Defendant was arrested in Georgia on the AWIKWA warrant in April 2002. On April 9, 2003, following a trial in D.C. Superior Court before the Honorable Susan R. Winfield in Case No. 2002 FEL 002132, , the jury returned a verdict finding defendant guilty on all counts (except for CPWL, UF, and UA, which were not submitted to the jury). The government's evidence at trial established the following:[3]

Defendant and Robert Ross met in 1991 through a mutual acquaintance. Ross worked in the music recording industry. When defendant was later "down on his luck," Ross gave defendant a security job at his recording studio, which was located in northeast Washington, D.C. In the months before the shooting, defendant borrowed Ross's car, a 1990 Jaguar, during the week, and tension arose when defendant had the car on the weekends, but would not return Ross's calls regarding the car. From November to December 1999, Ross made various efforts to get his car back from defendant, including through Marc Sheppard. Sheppard, who was known as "Half" or "Half-pint" because of his small stature, had met defendant in 1998 through the same mutual acquaintance. Defendant told Sheppard, age 28 at the time of the trial, that he could help him get a rap music deal. During the following year, defendant and Sheppard saw each other every day, and defendant introduced Sheppard to Ross. In the months before the shooting, Sheppard and Ross "became like best friends," and Sheppard stopped "hanging around" defendant as often. Because Sheppard and defendant were still speaking, however, Ross asked Sheppard to try to get Ross's car back.

---

[3]  The following narrative is drawn from the government's appellate brief — with citations to the trial record — filed in connection with defendant's appeal from his convictions in 2002 FEL 002132. We describe the facts in detail because this is relevant to an issue that we discuss *infra* at 29).

The direct events leading up to the shooting began on Saturday, January 15, 2000. That day, Sheppard and a friend known to Sheppard and other witnesses only as "Hodgie" went to a Chinese carry-out. At the carry-out, Sheppard met Malika McDaniels, age 23 at the time of the trial, and they exchanged phone numbers. The next day, January 16, McDaniels called Sheppard. That evening, McDaniels and Sheppard went to a motel on Georgia Avenue, along with Hodgie, Shashana Snow (McDaniels's friend), and Michelle King (McDaniels's cousin). Sheppard brought a .40-caliber firearm with him because he had been robbed previously when he had met women at hotels, fallen asleep, and then the women let someone into the room; Sheppard also had received a threat from his ex-girlfriend's family that day. Sheppard testified that he did not know the brand of the firearm, and that defendant had left it at Sheppard's house months earlier.

At the motel, the group "laugh[ed]," "dr[ank]," and "watch[ed]" television. At some point, McDaniels's cousin left because she had to go to work. The others left the motel around noon. Monica Townes, who was friends with both defendant and Sheppard, called Sheppard and told him that she had seen Ross's car at a nightclub. Ross then called Sheppard, and Sheppard told Ross about his call from Townes. Ross asked Sheppard if Ross should call the police or if Sheppard could try to get the car. Sheppard said he would try to get the car.

McDaniels had planned to go home that morning and get her infant daughter from her mother, but Sheppard asked McDaniels to take him to get keys to his car. McDaniels and Sheppard picked up Townes in McDaniels's car, and Hodgie and Snow were also still in the car. At around 2:00 p.m., they first stopped at an auto repair shop owned by defendant's uncle, Willie "Sonny" Renfrow, which was located on Naylor Road, S.E. Sheppard testified that he asked Renfrow if he "had seen [defendant]," and Renfrow said no. Sheppard then told Renfrow to "let [defendant] know that [Ross is] talking about calling the police," and that defendant should call him. Renfrow

saw Sheppard's gun in his coat pocket, which Renfrow identified as a .40-caliber Glock, and he called defendant and told him about the people looking for him. Renfrow initially testified that he did not tell defendant about the gun, but later testified that he did not remember if he did so. Defendant told Renfrow that defendant "would take care of it." McDaniels then drove the short distance to defendant's building at 3103 Naylor Road, S.E. She parked the car parallel to the curb, with the front door of the apartment building toward the front of her car. Sheppard testified that the gun was under his shirt, sweater, and zipped jacket, and that it was not visible.

Sheppard and Townes got out of the car. Sheppard knocked on defendant's door, and the nanny for defendant's children responded through the closed door that defendant was not there. Sheppard told the nanny to tell defendant that Ross was "about to call the police to find his car." Sheppard returned to McDaniels's car. Sheppard opened the passenger-side door, and had his foot half-way inside the car, when McDaniels yelled and Sheppard heard gunshots. Defendant had come out of his building with two guns. The glass next to Sheppard shattered. Defendant shot toward McDaniels's car, bullets hit the car, and windows shattered. Defendant walked toward Sheppard, and Sheppard, McDaniels, and Townes ran toward nearby shops. As McDaniels ran, she felt herself get hit in the back. Sheppard fell a few times and then "aimed at [defendant]" and returned fire to "defend [him]self." While Sheppard was shooting, defendant was still shooting and coming toward Sheppard and the shops. McDaniels heard three shots before she saw Sheppard reach for his gun.

When Sheppard's gun was empty, he got in McDaniels's car and drove in reverse down the street. Snow was ducked down in the backseat of the car. Townes was near the shops and got in the car. They did not see McDaniels. They went back to Sheppard's house. Defendant called Sheppard that night and said "[y]ou missed."

Renfrow heard the gunfire, and after the shooting stopped, he headed over toward defendant's building, where Renfrow also lived with his family. Renfrow saw McDaniels lying face down in front of the bus stop, and he put his jacket over her. McDaniels suffered a spinal cord injury as result of the shooting. It left her legs completely paralyzed, and her arms partially paralyzed. McDaniels's doctor testified that McDaniels likely would never walk again.[4]

On May 28, 2003, Judge Winfield initially sentenced defendant to a determinate sentence on each count. On October 17, 2003, Judge Winfield *sua sponte* re-sentenced defendant to an indeterminate sentence because the crime occurred before August 5, 2000. *See generally Richardson v. United States*, 927 A.2d 1137 (D.C. 2007) (discussing change to determinate sentences for crimes committed on or after August 5, 2000). The Court subsequently entered an amended judgment and commitment order on August 9, 2004; it sentenced defendant to an indeterminate sentences on each count, resulting in a 20-year sentence with a 15-year mandatory minimum — an aggregate sentence of 20 to 60 years.[5]

On February 6, 2004, the Board of Parole supplemented the parole violation warrant to include defendant's convictions for AWIKWA and the other charges as a basis for the warrant (Attachment A). Meanwhile, defendant served his sentence in the Superior Court case.

According to BOP records, defendant satisfied his Superior Court sentence on April 21, 2020, having served 18 years, 1 month, and 4 days — 90.4 % of his full term, and was placed on supervised release (Attachment E – BOP Sentence Computation Data). The parole warrant issued

---

[4]   The defense did not present any witnesses. The defense theory was that Sheppard was the only one shooting a weapon and that he shot McDaniels by accident.

[5]   On October 21, 2009, on remand after appeal, the Court resentenced defendant as follows: AWIKWA (Count B) – 10 to 30 years; PFCOV (Count C) – 5 to 15 years; AWIKWA (Count D) – 8 to 24 years; AWIKWA (Count F) – 8 to 24 years; AWIKWA (Count H) – 5 to 15 years; mayhem while armed (Count J) – 5 to 15 years. The sentences for Counts C and J were consecutive to the sentences on the other counts – an aggregate sentence of 20 to 60 years.

9

in connection with this Court's case was executed that same day (Attachment A). According to

USPC records, defendant's recalculated mandatory release date is July 13, 2022; his recalculated

full term date is March 12, 2023 (*id.*). Defendant is currently at FCI Butner Medium II.

**C.       BOP's Response to the COVID-19 Pandemic**

As this Court is well aware, COVID-19 is an extremely dangerous illness that has caused

many deaths in the United States in a short period of time and that has resulted in massive

disruption to our society and economy. In response to the pandemic, BOP has taken significant

measures to protect the health of the inmates in its charge.

BOP has explained that "maintaining safety and security of [BOP] institutions is [BOP's]

highest priority." BOP, Updates to BOP COVID-19 Action Plan: Inmate Movement (Mar. 19,

2020), available at https://www.bop.gov/resources/news/20200319_covid19_update.jsp.

Indeed, BOP has had a Pandemic Influenza Plan in place since 2012. BOP Health Services

Division, Pandemic Influenza Plan-Module 1: Surveillance and Infection Control (Oct. 2012),

available at https://www.bop.gov/resources/pdfs/pan_flu_module_1.pdf. That protocol is lengthy

and detailed, establishing a multi-phase framework requiring BOP facilities to begin preparations

when there is first a "[s]uspected human outbreak overseas." *Id*. at i. The plan addresses social

distancing, hygienic and cleaning protocols, and the quarantining and treatment of symptomatic

inmates.

Consistent with that plan, BOP began planning for potential coronavirus transmissions in

January. At that time, the agency established a working group to develop policies in consultation

with subject matter experts in the Centers for Disease Control, including by reviewing guidance

from the World Health Organization.

On March 13, 2020, BOP began to modify its operations, in accordance with its Coronavirus (COVID-19) Action Plan ("Action Plan"), to minimize the risk of COVID-19 transmission into and inside its facilities. Since that time, as events require, BOP has repeatedly revised the Action Plan to address the crisis.

BOP's operations are presently governed by Phase Seven of the Action Plan. The current modified operations plan requires that all inmates in every BOP institution be secured in their assigned cells/quarters, in order to stop any spread of the disease. Only limited group gathering is afforded, with attention to social distancing to the extent possible, to facilitate commissary, laundry, showers, telephone, and computer access. Further, BOP has severely limited the movement of inmates and detainees among its facilities. Though there will be exceptions for medical treatment and similar exigencies, this step as well will limit transmissions of the disease. Likewise, all official staff travel has been cancelled, as has most staff training.

All staff and inmates have been and will continue to be issued face masks and strongly encouraged to wear an appropriate face covering when in public areas when social distancing cannot be achieved.

Every newly admitted inmate is screened for COVID-19 exposure risk factors and symptoms. Asymptomatic inmates with risk of exposure are placed in quarantine for a minimum of 14 days or until cleared by medical staff. Symptomatic inmates are placed in isolation until they test negative for COVID-19 or are cleared by medical staff as meeting CDC criteria for release from isolation. In addition, in areas with sustained community transmission, all facility staff are screened for symptoms. Staff registering a temperature of 100.4 degrees Fahrenheit or higher are barred from the facility on that basis alone. A staff member with a stuffy or runny nose can be placed on leave by a medical officer.

11

Contractor access to BOP facilities is restricted to only those performing essential services (e.g. medical or mental health care, religious, etc.) or those who perform necessary maintenance on essential systems. All volunteer visits are suspended absent authorization by the Deputy Director of BOP. Any contractor or volunteer who requires access will be screened for symptoms and risk factors.

Social and legal visits were stopped as of March 13, and remain suspended at this time, to limit the number of people entering the facility and interacting with inmates. In order to ensure that familial relationships are maintained throughout this disruption, BOP has increased detainees' telephone allowance to 500 minutes per month. Tours of facilities are also suspended. Legal visits will be permitted on a case-by-case basis after the attorney has been screened for infection in accordance with the screening protocols for prison staff.

Further details and updates of BOP's modified operations are available to the public on the BOP website at a regularly updated resource page: www.bop.gov/coronavirus/index.jsp.

In addition, in an effort to relieve the strain on BOP facilities and assist inmates who are most vulnerable to the disease and pose the least threat to the community, BOP is exercising greater authority to designate inmates for home confinement. On March 26, 2020, the Attorney General directed the Director of the Bureau of Prisons, upon considering the totality of the circumstances concerning each inmate, to prioritize the use of statutory authority to place prisoners in home confinement (Attachment F – Attorney General Memorandum. March 26, 2020). That authority includes the ability to place an inmate in home confinement during the last six months or 10% of a sentence, whichever is shorter, *see* 18 U.S.C. § 3624(c)(2), and to move to home confinement those elderly and terminally ill inmates specified in 34 U.S.C. § 60541(g). Congress has also acted to enhance BOP's flexibility to respond to the pandemic. Under the Coronavirus Aid, Relief, and Economic Security Act, enacted on March 27, 2020, BOP may "lengthen the maximum amount of time for which the Director is authorized to place a prisoner in home confinement" if the Attorney General finds that emergency conditions will materially affect the functioning of BOP.  Pub. L. No. 116-136, § 12003(b)(2), 134 Stat. 281, 516 (to be codified at 18 U.S.C. § 3621 note). On April

3, 2020, the Attorney General gave the Director of BOP the authority to exercise this discretion, beginning at the facilities that thus far have seen the greatest incidence of coronavirus transmission (Attachment G – Attorney General Memorandum for Director of Bureau of Prisons, April 3, 2020). As of this filing, BOP has transferred almost 3,900 inmates to home confinement. *See* Federal Bureau of Prisons, *COVID-19 Home Confinement Information*, *at* https://www.bop.gov/coronavirus/.

Taken together, all of these measures are designed to mitigate sharply the risks of COVID-19 transmission in a BOP institution. BOP has pledged to continue monitoring the pandemic and to adjust its practices as necessary to maintain the safety of prison staff and inmates while also fulfilling its mandate of incarcerating all persons sentenced or detained based on judicial orders.

Unfortunately and inevitably, some inmates have become ill, and more likely will in the weeks ahead. But BOP must consider its concern for the health of its inmates and staff alongside other critical considerations. For example, notwithstanding the current pandemic crisis, BOP must carry out its charge to incarcerate sentenced criminals to protect the public. It must consider the effect of a mass release on the safety and health of both the inmate population and the citizenry. It must marshal its resources to care for inmates in the most efficient and beneficial manner possible. It must assess release plans, which are essential to ensure that a defendant has a safe place to live and access to health care in these difficult times. And it must consider myriad other factors, including the availability of both transportation for inmates (at a time that interstate transportation services often used by released inmates are providing reduced service), and supervision of inmates once released (at a time that the Probation Office has necessarily cut back on home visits and supervision).

## D.     Defendant's Request for a Sentence Reduction

On May 18, 2020, defendant filed a motion with this Court seeking compassionate release pursuant to compassionate release provision in "The COVID-19 Response Supplemental Emergency Act of 2020" ("COVID-19 Emergency Act") On May 29, 2020, defendant filed his supplemental memorandum in which he argues that the Court has jurisdiction to grant his motion

under the District of Columbia statute, but, in the alternative, he also seeks compassionate release under 18 U.S.C. § 3582(c)(1)(A). He seeks his immediate release, relying on the threat posed by the COVID-19 pandemic. Defendant, who is 50 years old, states that he is afflicted with "advanced chronic obstructive pulmonary disease (COPD)," as well as obstructive sleep apnea, diabetes, hypertension and morbid obesity,[6] and that he "has required intubation and mechanical ventilation as many as 11 times during the course of his incarceration due to his compromised respiratory system" (Motion at 1, 4, 6; Supp. Mem. at 8-9).  Defendant asserts that his medical conditions, in conjunction with the threat of COVID-19, "constitute extraordinary and compelling reasons to reduce [his] sentence" (Supp. Mem. at 8). In addition, defendant argues that "this Court can be assured that a sentence of time-served would meet the ends of justice and would not pose a public safety threat" (Supp. Mem. at 9). Defendant argues that he has "significantly reformed his life while incarcerated," and states that he has "used his over two decades of incarceration to engage in rehabilitative programs, has a physical condition that militates against the likelihood of recidivism, and has the support of his family" (Motion at 8; Supp. Mem. at 9). He also asserts that he :"has had only minor disciplinary infractions in the last 5 years and no significant infractions or infractions involving violence in at least 10 years" (Motion at 7-8).

Defendant concedes that he has failed to exhaust his administrative remedies as required by 18 U.S.C. § 3582(c)(1)(A), but argues that this Court should excuse the exhaustion requirement for good cause. First, defendant states that he had a good faith basis for seeking compassionate release under the District of Columbia statute without regard to the applicable federal law, and the District of Columbia statute does not require exhaustion of administrative remedies (Supp. Mem. at 7). He also states that because the government argued in other cases that the federal law does not apply to DC prisoners serving time for convictions based on D.C. Code offenses (an argument that has been rejected, *see United States v. Hammond*, Crim. No. 02-294, 2020 WL 1891980 (D.D.C. April 16, 2020), an individual in his situation "could quite reasonably . . . believe that he

---

[6]  Defendant states that he weighs nearly 400 pounds, and has a Body Mass Index ("BMI") of 46.9 (Motion at 4; Supp. Mem. at 8).

was not obligated to pursue exhaustion before seeking relief under the new D.C. law (*id.*). Finally, defendant argues that "requiring him to effectively 'start from scratch' with efforts to exhaust under these exigent circumstances, subject to the increased delay and resulting increased exposure to infection that such requirement would entail, is wholly unwarranted" (*id.*).

Defendant is incarcerated at FCI Butner Medium II. Currently, at the time this pleading was filed, the BOP website reflects that 2 inmates at FCI Butner Medium II are positive for COVID-19. There are no staff members who are positive. There have been no inmate or staff deaths at FCI Butner Medium II related to COVID-19. https://www.bop.gov/coronavirus/.

## II.     LEGAL FRAMEWORK-FEDERAL COMPASSIONATE RELEASE

Under 18 U.S.C. § 3582(c)(1)(A), as amended by the First Step Act, this Court may, in certain circumstances, grant a defendant's motion to reduce his or her term of imprisonment. A court may grant the defendant's own motion for a reduction in his sentence only if the motion was filed "after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf" or 30 days have passed "from the receipt of such a request by the warden of the defendant's facility, whichever is earlier." *Id*.

If that exhaustion requirement is met, a court may reduce the defendant's term of imprisonment "after considering the factors set forth in [18 U.S.C. § 3553(a)]" if the Court finds, as relevant here, that (i) "extraordinary and compelling reasons warrant such a reduction" and (ii) "such a reduction is consistent with applicable policy statements issued by the Sentencing Commission." § 3582(c)(1)(A)(i). As the movant, the defendant bears the burden to establish that he or she is eligible for a sentence reduction. *United States v. Jones*, 836 F.3d 896, 899 (8th Cir. 2016); *United States v. Green*, 764 F.3d 1352, 1356 (11th Cir. 2014).

The Sentencing Commission has issued a policy statement addressing reduction of sentences under § 3582(c)(1)(A). As relevant here, the policy statement provides that a court may

15

reduce the term of imprisonment after considering the § 3553(a) factors if the Court finds that (i) "extraordinary and compelling reasons warrant the reduction;" (ii) "the defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g);" and (iii) "the reduction is consistent with this policy statement." USSG § 1B1.13.[7]

The policy statement includes an application note that specifies the types of medical conditions that qualify as "extraordinary and compelling reasons."

(A)     **Medical Condition of the Defendant.**—

(i)      The defendant is suffering from a terminal illness (i.e., a serious and advanced illness with an end of life trajectory).  A specific prognosis of life expectancy (*i.e.*, a probability of death within a specific time period) is not required.  Examples include metastatic solid-tumor cancer, amyotrophic lateral sclerosis (ALS), end-stage organ disease, and advanced dementia.

(ii)     The defendant is—

(I)       suffering from a serious physical or medical condition,

(II)      suffering from a serious functional or cognitive impairment, or

(III)     experiencing deteriorating physical or mental health because of the aging process, that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover.

(B)     **Age of the Defendant** — The Defendant is (i) at least 65 years old; (ii) is experiencing a serious deterioration in physical or mental health because of the ageing process; and (iii) has served at least 10 years or 75 percent of his or her term of imprisonment, whichever is less.

(C)     **Family Circumstances.** —

---

[7]      The policy statement refers only to motions filed by the BOP Director. That is because the policy statement was last amended on November 1, 2018, and until the enactment of the First Step Act on December 21, 2018, defendants were not entitled to file motions under § 3582(c). *See* First Step Act of 2018, Pub. L. No. 115-391, § 603(b), 132 Stat. 5194, 5239; *cf.* 18 U.S.C. § 3582(c) (2012). In light of the statutory command that any sentence reduction be "consistent with applicable policy statements issued by the Sentencing Commission," § 3582(c)(1)(A)(ii), and the lack of any plausible reason to treat motions filed by defendants differently from motions filed by BOP, the policy statement applies to motions filed by defendants as well.

(i)     The death or incapacitation of the caregiver of the defendant's minor child or minor children.

(ii)    The incapacitation of the defendant's spouse or registered partner when the defendant would be the only available caregiver for the spouse or the registered partner.

USSG § 1B1.13 cmt. n.1. The application note also recognizes the possibility that BOP could identify other grounds that amount to "extraordinary and compelling reasons." USSG § 1B1.13, cmt. n.1(D).

Thus, in order to qualify for compassionate release after having exhausted his or her administrative remedies with BOP, a defendant must be able to demonstrate one of the listed reasons in (A)–(C) above. *See United States v. Shields*, 2019 WL 2645028, at *2 (N.D. Cal. June 27, 2019). Defendant bears the burden to show special circumstances meeting the high bar set by Congress and the Sentencing Commission for compassionate release to be granted. *See United States v. Greenhut*, 2020 WL 509385, at *1 (C.D. Cal. Jan. 31, 2020) (holding that defendant bears the burden of establishing entitlement to sentencing reduction and citing *United States v. Sprague*, 135 F.3d 1301, 1306-1307 (9th Cir. 1998)).

## ARGUMENT

This Court should deny without prejudice defendant's claim under the federal compassionate release statute because he has failed to exhaust administrative remedies. Should the Court reach the merits of this claim, the Court should deny it with prejudice because defendant has not met his burden to show that a reduction is warranted in light of the danger that defendant would pose to the community and the relevant § 3553(a) factors. The Court should deny defendant's claim under the D.C. compassionate release because, as a defendant convicted of federal and D.C. Code offenses in this Court, defendant may not seek relief under this statute. Further, even if

defendant were eligible under the local statute, he has failed to show that he should be granted early release.

I.  **This Court Should Deny Without Prejudice Defendant's Claim for Relief under the Federal Compassionate Release Statute Because Defendant Has Not Exhausted His Administrative Remedies.**

This Court lacks authority to act on defendant's claim for a sentence reduction under the federal compassionate release statute at this time. As explained above, § 3582(c) requires that a request for a sentence reduction be presented first to BOP for its consideration; only after 30 days have passed, or the defendant has exhausted all administrative rights to appeal the BOP's failure to move on the defendant's behalf, may a defendant move for a sentence reduction in court. That restriction is mandatory, and it continues to serve an important function during the present crisis. The government is very mindful of the concerns created by COVID-19, and BOP is making its best effort both to protect the inmate population and to address the unique circumstances of individual inmates.

Section 3582(c) provides that a court may not modify a term of imprisonment once it has been imposed unless it "upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment . . . ." § 3582(c)(1)(A). Contrary to defendant's assertion, the requirement that a defendant either exhaust administrative appeals or wait 30 days after presenting a request to the warden before seeking judicial relief is mandatory and must be enforced by the Court. As the Third Circuit recently confirmed, where 30 days have not passed following presentation of a request to a warden, the statute "presents a glaring roadblock foreclosing compassionate release at this point." *United States v. Raia*, 954 F.3d 594, 597 (3d Cir. 2020); *see also United States v. Alam*, __ F.3d __, 2020 WL 2845694, *3 (June 2, 2020) (agreeing with *Raia*). The vast majority of district courts to address this issue agree. *See, e.g.*, *United States v. Gonzalez*,

2020 WL 1940666 (D. Conn. Apr. 22, 2020) (citing cases); *United States v. Ogarro*, 2020 WL 1876300, at \*3 (S.D.N.Y. Apr. 14, 2020) (concluding that "section 3582(c)'s exhaustion proscription is clear as day" and "[b]ecause the statutory language is unambiguous and mandatory, it must be 'strictly enforce[d].' ") (*quoting Theodoropoulos v. INS*, 358 F.3d 162, 172 (2d Cir. 2004)); *United States v. Feiling*, 2020 WL 1821457 (E.D. Va. Apr. 10, 2020) ("absent exceptional circumstances, courts have been reluctant to grant waivers of the exhaustion requirement simply because COVID-19 threatens an inmate's health"); *United States v. Epstein*, 2020 WL 1808616 (D.N.J. Apr. 9, 2020) (citing numerous cases).[8]

Further, "'a judgment of conviction that includes [a sentence of imprisonment] constitutes a final judgment' and may not be modified by a district court except in limited circumstances." *Dillon v. United States*, 560 U.S. 817, 824 (2010). As the Supreme Court has recognized, finality is an important attribute of criminal judgments, and one "essential to the operation of our criminal justice system." *Teague v. Lane*, 489 U.S. 288, 309 (1989) (plurality opinion). Accordingly, it is well established that once a district court has pronounced sentence and the sentence becomes final, the court has no inherent authority to reconsider or alter that sentence. Rather, it may do so only if

---

[8]   The government notes that it is aware of two cases in this jurisdiction, including one before this Court, in which the government did not oppose compassionate release motions on exhaustion grounds. One case is *United States v. Samuel H. Powell*. There, the defendant argued in his unopposed motion that there was exhaustion because the parties and the Court previously recommended that the BOP release the defendant to home confinement, and the BOP had denied the request. *See* 94-cr-00316 (ESH), Dkt. 96 at 5. In the alternative, the defendant argued that the Court should waive the exhaustion requirement because it would be futile, given the BOP's previous decision on home confinement. *See id*. The government did not file a written response, but it had indicated to the defense that the government did not oppose release. *See id*. at 1 n.1. The defendant filed his motion on March 27, 2020, and the Court granted release in an Order issued that same day. *See id*. at Dkt. 96, 97. One week later, in *United States v. Ghorbani*, the government and defense filed a joint submission that explicitly argued in a footnote that the exhaustion requirement is waivable. *See* 18-cr-255 (PLF), Dkt. 129 at 2 n.1. The compassionate release motions filed in these two cases were among the earliest such motions filed in this jurisdiction. Regrettably, in these cases the government took, either implicitly or explicitly, a position at odds with Department of Justice guidance. In the instant case, as in the other compassionate release motions litigated here, the government asserts the exhaustion requirement, for the reasons stated in the text above.

authorized by statute. *See, e.g.*, *United States v. Addonizio*, 442 U.S. 178, 189 & n.16 (1979); *United States v. Washington*, 549 F.3d 905, 917 (3d Cir. 2008); *United States v. Smartt*, 129 F.3d 539, 540 (10th Cir. 1997) ("A district court does not have inherent authority to modify a previously imposed sentence; it may do so only pursuant to statutory authorization.") (internal quotation marks omitted).

Consistent with that principle of finality, § 3582(c) provides that a court generally "may not modify a term of imprisonment once it has been imposed," except in three circumstances: (i) upon a motion for reduction in sentence under § 3582(c)(1)(A), such as that presented by the defendant; (ii) "to the extent otherwise expressly permitted by statute or by Rule 35 of the Federal Rules of Criminal Procedure," § 3582(c)(1)(B); and (iii) where the defendant was sentenced "based on" a retroactively lowered sentencing range, § 3582(c)(2).

Given the plain language and purpose of the statute, the requirements for filing a sentence-reduction motion—including the requirement that a defendant exhaust administrative remedies or wait 30 days before moving in court for a reduction—are properly viewed as jurisdictional. Section 3582(c) states that a "court may not modify" a term of imprisonment except in enumerated circumstances. 18 U.S.C. § 3582(c). It thus "speak[s] to the power of the court rather than to the rights or obligations of the parties," *Landgraf v. USI Film Prods.*, 511 U.S. 244, 274 (1994) (internal quotation marks omitted), delineating "when, and under what conditions," a court may exercise its "'adjudicatory authority,'" *Bowles v. Russell*, 551 U.S. 205, 212-13 (2007) (quoting *Eberhart v. United States*, 546 U.S. 12, 16 (2005) (per curiam)). That conclusion is reinforced by the historical powerlessness of the courts to modify a sentence after the expiration of the term at which it was entered. *See United States v. Mayer*, 235 U.S. 55, 67-69 (1914); *United States v. Welty*, 426 F.2d 615, 617-618 & n.8 (3d Cir. 1970). Section 3582(c) accordingly has been

understood as conferring the jurisdictional authority that previously was lacking by providing express statutory authorization to modify otherwise final sentences.[9]

In recent years, the Supreme Court has cautioned against imprecise use of the "jurisdictional" label, and explained that a statutory claim-processing rule, even if mandatory, is presumed to be nonjurisdictional absent a clear statement to the contrary. *See Fort Bend County v. Davis*, 139 S. Ct. 1843, 1848-50 (2019). A prescription is not jurisdictional merely because "it 'promotes important congressional objectives,'" *id*. at 1851 (quoting *Reed Elsevier, Inc. v. Muchnick*, 559 U.S. 154, 169 n.9 (2010)), and courts should not deem jurisdictional rules that "seek to promote the orderly progress of litigation by requiring that the parties take certain procedural steps at certain specified times," *Henderson v. Shinseki*, 562 U.S. 428, 435 (2011). But whether a prescription is jurisdictional turns on Congress's intent, which is properly determined by the text, context, relevant historical treatment, and purpose of the provision. *Henderson*, 562 U.S. at 436. Here, the relevant factors indicate that § 3582(c) sets forth a jurisdictional limitation on a district court's authority to modify a sentence, such that a district court lacks jurisdiction to consider a motion for a sentence reduction where the defendant has failed to satisfy the exhaustion requirement of § 3582(c)(1)(A).[10]

While the government maintains that the time limitation in § 3582(c)(1)(A) is jurisdictional, given that it stands as an exception to the historic and fundamental rule that courts may not revisit a final criminal judgment, the point is ultimately academic. Even if the exhaustion requirement of § 3582(c)(1)(A) is not jurisdictional, it is at least a mandatory claim-processing rule and must be enforced if a party "properly raise[s]" it. *Eberhart*, 546 U.S. at 19 (holding that

---

[9]   The D.C. Circuit has not decided the issue. *See United States v. Smith*, 467 F.3d 785, 788 (D.C. Cir. 2006) (noting that "Congress has, in language with a somewhat jurisdictional flavor, limited district court authority to modify sentences" but also that *Eberhart v. United States*, 546 U.S. 12 (2005), calls such a jurisdictional reading of § 3582(c) into question).

[10]   Although we use the term "exhaustion requirement," to be clear, an inmate need not "exhaust" administrative remedies if the motion is filed in court 30 days after receipt of a request by the warden.

Fed. R. Crim. P. 33, which permits a defendant to move for a new trial within 14 days of the verdict, is a nonjurisdictional but mandatory claim-processing rule). The government raises the rule here, and it must be enforced.[11]

Defendant concedes that he has failed to exhaust his administrative requirements under § 3582(c)(1)(A). He nevertheless argues that this Court may ignore the exhaustion requirement in light of the crisis presented by the coronavirus pandemic. That is incorrect. While judicially created exhaustion requirements may sometimes be excused, it is well settled that a court may not ignore a statutory command such as that presented in § 3582(c)(1)(A). *McCarthy v. Madigan*, 503 U.S. 140, 144 (1992) ("[w]here Congress specifically mandates, exhaustion is required"). Indeed, the Supreme Court recently reaffirmed that principle in *Ross v. Blake*, 136 S. Ct. 1850 (2016), in which it rejected a judicially created "'special circumstances'" exception to a statutory exhaustion requirement. Rejecting the "freewheeling approach" adopted by some courts of appeals, under which some prisoners were permitted to pursue litigation even when they had failed to exhaust available administrative remedies, *Ross*, 136 S. Ct. at 1855, the Court demanded fidelity to the statutory text, explaining that the "mandatory language" of the exhaustion requirement "means a court may not excuse a failure to exhaust" even to accommodate exceptional circumstances, *id.* at 1856.

Some have suggested that the exhaustion requirement of § 3582(c)(1)(A) may be excused by a court as "futile" during the present pandemic. But there is no "futility" exception, as the Supreme Court has made clear that courts have no authority to invent an exception to a statutory exhaustion requirement. Two district courts have recently rejected the argument that any such futility exception exists under § 3582. *See United States v. Holden*, 2020 WL 1673440, at *5 (D.

---

[11]  Indeed, even those courts that have concluded that the requirements of § 3582(c)(2) are not jurisdictional still enforce the statutory prerequisites to relief. *See, e.g.*, *United States v. Taylor*, 778 F.3d 667, 670 (7th Cir. 2015) (recognizing that even if a court has the "power to adjudicate" a motion under § 3582(c)(2), it may lack "authority to *grant* a motion . . . because the statutory criteria are not met") (emphasis in original).

Or. Apr. 6, 2020); *United States v. Eberhart*, 2020 WL 1450745, at *1 (N.D. Cal. Mar. 25, 2020). While a few district courts have incorrectly excused the § 3582 exhaustion requirement as futile, two of those decisions have rested on the fact that the defendant had a matter of days left to serve on the sentence, a consideration not present in this case. *See United States v. Colvin*, 2020 WL 1613943, at *1 (D. Conn. Apr. 2, 2020) (finding exhaustion futile because inmate had 11 days left on her sentence); *United States v. Perez*, 2020 WL 1546422, at *1 (S.D.N.Y. Apr. 1, 2020) (finding exhaustion futile because inmate had less than 21 days left on his sentence and was recovering from two vicious beatings while in prison); *but see United States v. Zukerman*, 2020 WL 1659880, at *1 (S.D.N.Y. Apr. 3, 2020) (finding exhaustion futile where obese, 75-year old inmate suffered from diabetes and hypertension). At least one of those decisions incorrectly relied on precedent addressing a judicially created—as opposed to statutorily created—exhaustion requirement. *See Perez*, 2020 WL 1546422 at *2 (relying only on *Washington v. Barr*, 925 F.3d 109, 118 (2d Cir. 2019)).[12] And in any event, a request in this context is not futile, because, as explained further below, BOP fully considers requests for sentence reductions. Indeed, BOP often concurs with such requests. During the period from the passage of the First Step Act on December 21, 2018, until mid-March 2020 (before the coronavirus crisis began), BOP consented to a reduction in sentence in 55 cases.

---

[12]   To the extent *Perez* also suggests that *Mathews v. Eldridge*, 424 U.S. 319 (1976), supports an exception to the exhaustion requirement here, *see* 2020 WL 1546422, at *2 n.2, that is incorrect. In *Eldridge*, the claimant complied with the "nonwaivable and nonexcusable requirement that an individual present a claim to the agency before raising it in court." *Shalala v. Ill. Council on Long Term Care, Inc.*, 529 U.S. 1, 16 (2000). And while the Court in *Eldridge* recognized that a constitutional challenge "entirely collateral to [the claimant's] substantive claim of entitlement" might evade a statutory exhaustion requirement, 424 U.S. at 330, defendant's claim for relief in this Court is the same claim he was required to present to BOP. *See also United States v. Demaria*, 2020 WL 1888910, at *3 & n.8 (S.D.N.Y. Apr. 16, 2020) (explaining the *Perez* error at length and the inapplicability of the cases on which it relied).

The requirement of a 30-day period to afford BOP the initial review of the defendant's request therefore cannot be excused.[13]

---

[13]   A handful of courts, mostly in the Second Circuit, have agreed with *Perez* that the exhaustion requirement may be negated. *See also, e.g.*, *United States v. Colvin*, 2020 WL 1613943 (D. Conn. Apr. 2, 2020) (11 days remaining on sentence); *United States v. McCarthy*, 2020 WL 1698732 (D. Conn. Apr. 8, 2020) (26 days remaining on sentence); *United States v. Ben-Yhwh*, 2020 WL 1874125 (D. Haw. Apr. 13, 2020); *United States v. Coles*, 2020 WL 1899562 (E.D. Mich. Apr. 17, 2020); *United States v. Zukerman*, 2020 WL 1659880 (S.D.N.Y. Apr. 3, 2020); *United States v. Haney*, 2020 WL 1821988 (S.D.N.Y. Apr. 13, 2020); *United States v. Paciullo*, 2020 WL 1862252, at *2 (S.D.N.Y. Apr. 14, 2020) (court strikes a "compromise" and allows BOP 20 days); *United States v. Russo*, 2020 WL 1862294 (S.D.N.Y. Apr. 14, 2020); *United States v. Smith*, 2020 WL 1849748 (S.D.N.Y. Apr. 13, 2020).

A number of other district courts in the Second Circuit disagree, while virtually every other district court in the country to consider this issue in a reported decision agrees with *Raia* and the government here that the 30-day requirement must be enforced. *See, e.g.*, *United States v. Gillis*, 2020 WL 1846792 (C.D. Cal. Apr. 9, 2020); *United States v. Meron*, 2020 WL 1873900 (E.D. Cal. Apr. 15, 2020); *United States v. Hembry*, 2020 WL 1821930 (N.D. Cal. Apr. 10, 2020); *United States v. Smith*, 2020 WL 1903160 (D. Conn. Apr. 17, 2020); *United States v. Perry*, 2020 WL 1676773 (D. Colo. Apr. 3, 2020); *United States v. Zywotko*, 2020 WL 1492900 (M.D. Fla. Mar. 27, 2020); *United States v. Read-Forbes*, 2020 WL 1888856 (D. Kan. Apr. 16, 2020); *United States v. Boyles*, 2020 WL 1819887 (D. Kan. Apr. 10, 2020); *United States v. Carter*, 2020 WL 1808288 (S.D. Ind. Apr. 9, 2020); *United States v. Hofmeister*, 2020 WL 1811365, at *3 (E.D. Ky. Apr. 9, 2020) (explaining that the rule is jurisdictional, and perhaps even more necessary during COVID-19 crisis); *United States v. Reeves*, 2020 WL 1816496 (W.D. La. Apr. 9, 2020); *United States v. Lugo*, 2020 WL 1821010, at *3 (D. Me. Apr. 10, 2020) (extensive analysis, concluding, "The Court regards the language of section 3582(c) as both clear and mandatory."); *United States v. Johnson*, 2020 WL 1663360, at *3-*6 (D. Md. Apr. 3, 2020) (concluding in lengthy discussion that § 3582(c)(1)(A)'s exhaustion requirement is jurisdictional and, regardless, there are no exceptions to the exhaustion requirement); *United States v. Underwood*, 2020 WL 1820092 (D. Md. Apr. 10, 2020); *United States v. Carden*, 2020 WL 1873951 (D. Md. Apr. 15, 2020); *United States v. Alam*, 2020 WL 1703881 (E.D. Mich. Apr. 8, 2020); *United States v. Mathews*, 2020 WL 1873360 (E.D. Mich. Apr. 15, 2020); *United States v. Annis*, 2020 WL 1812421, at *2 (D. Minn. Apr. 9, 2020) (Tunheim, C.J.) ("There is no question that COVID-19 is a cause for alarm, and the Court does not fault Annis's concerns, given his health conditions. However, given the scale of the COVID-19 pandemic and the complexity of the situation in federal institutions, it is even more important that Annis first attempt to use the BOP's administrative remedies."); *United States v. Gardner*, 2020 WL 1867034 (D. Minn. Apr. 14, 2020); *United States v. Eisenberg*, 2020 WL 1808844 (D.N.H. Apr. 9, 2020); *United States v. Ogarro*, 2020 WL 1876300, at *3 (S.D.N.Y. Apr. 14, 2020) (lengthy analysis, stating, "In fact, section 3582(c)'s exhaustion proscription is clear as day."); *United States v. Pereyra-Polanco*, 2020 WL 1862639 (S.D.N.Y. Apr. 14, 2020); *United States v. Roberts*, 2020 WL 1700032 (S.D.N.Y. Apr. 8, 2020); *United States v. Woodson*, 2020 WL 1673253 (S.D.N.Y. Apr. 6, 2020); *United States v. Weiland*, 2020 WL 1674137 (S.D.N.Y. Apr. 6, 2020); *United States v. Rabadi*, 2020 WL 1862640, at *3 (S.D.N.Y. Apr. 14, 2020) (follows "vast majority" of courts); *United States v. Schultz*, 2020 WL 1872352 (W.D.N.Y. Apr. 15, 2020); *United States v. Allen*, 2020 WL 1878774 (N.D. Ohio Apr. 15, 2020); *United States v. Simmons*, 2020 WL 1903281 (D. Or. Apr. 17, 2020); *United States v. Holden*, 2020 WL 1673440 (D. Or. Apr. 6, 2020) (very extensive discussion); *United States v. Epstein*, 2020 WL 1808616 (D.N.J. Apr. 9, 2020) (cites numerous cases in agreement); *United States v. Petrossi*, 2020 WL 1865758 (M.D. Pa. Apr. 14, 2020); *United States v. Feiling*, 2020 WL 1821457 (E.D. Va. Apr. 10, 2020); *United States v. Fuller*, 2020 WL 1847751 (W.D. Wash. Apr. 13, 2020); *United States v. Carver*, 2020 WL 1604968 (E.D. Wash. Apr., 1, 2020); *United States v. Fevold*, 2020 WL 1703846, at *1 (E.D. Wis. Apr. 8, 2020) ("Not only is exhaustion of administrative remedies required as a matter of law, but it also makes good policy sense. The warden and those in charge of inmate health and safety are in a far better position than the sentencing court to know the risks inmates in their custody are facing and the facility's ability to mitigate those risks and provide for the care and safety of the inmates.").

While Congress indisputably acted in the First Step Act to expand the availability of compassionate release, it expressly imposed on inmates the requirement of initial resort to administrative remedies. And this is for good reason: BOP conducts an extensive assessment for such requests. *See* 28 C.F.R. § 571.62(a); BOP Program Statement 5050.50, Compassionate Release/Reduction in Sentence: Procedures for Implementation of 18 U.S.C. §§ 3582(c)(1)(A) and 4205(g), *available at* https://www.bop.gov/policy/progstat/5050_050_EN.pdf. As the Procedures reflect, the BOP completes a diligent and thorough review, with considerable expertise concerning both the inmate and the conditions of confinement. Its assessment will always be of value to the parties and the Court.

That is especially true during the current crisis. As explained above, BOP must balance a host of considerations in deciding whether to release an inmate to recommend a reduction in an inmate's sentence or grant the inmate home confinement—not only the health of the inmate and BOP staff, but also the safety of the public. BOP is best positioned to determine the proper treatment of the inmate population as a whole, taking into account both individual considerations in light of on an inmate's background and medical history and more general considerations regarding the conditions and needs at particular facilities. The provision of § 3582(c)(1)(A) prioritizing administrative review therefore makes sense not only in the ordinary case, but also at this perilous time. As the Third Circuit has held, "[g]iven BOP's shared desire for a safe and healthy prison environment, . . . strict compliance with § 3582(c)(1)(A)'s exhaustion requirement takes on added—and critical—importance." *Raia*, 954 F.3d at 597. *See also United States v. McCann,* 2020 WL 1901089, at *2 (E.D. Ky. Apr. 17, 2020) ("The Court recognizes that these are unsettling times for everyone, including prisoners. But in such a context, the exhaustion requirement of the compassionate release statute is perhaps most important.").

Accordingly, defendant's claim under the federal compassionate release statute should be denied without prejudice to refiling once he has exhausted administrative remedies.

II. **Should the Court Reach the Merits of Defendant's Claim under the Federal Statute, the Court Should Deny The Claim Because Defendant Poses a Danger to Public Safety.**

At the present time, it is apparent that, but for the COVID-19 pandemic, defendant would present no basis for compassionate release. His medical ailments seem to be monitored and well-controlled, and do not present any impediment to his ability to provide self-care in the institution. The only question, then, is whether the risk of COVID-19 changes that assessment.

The government acknowledges that defendant presents risk factors identified by the CDC as heightening the risk of severe injury or death were he to contract COVID-19. The BOP medical records confirm that defendant's medical conditions include diabetes, morbid or severe obesity, and COPD (Exhibit 9 to defendant's Supp. Mem. at 147-148). [14] The government agrees that defendant has "serious physical or medical condition[s]" that substantially diminish[] the ability of the defendant to provide self-care within the environment of a correctional facility," as stated in § 1B1.13, cmt. n. 1(A)(ii). [15]

However, defendant is not entitled to relief. Even where a defendant has established an "extraordinary and compelling reason," under the applicable policy statement, this Court must

---

[14]   The records show that defendant has a history of obstructive sleep apnea and obstructive chronic bronchitis (Exhibit 9 to defendant's Supp. Mem. at 143, 147-148). The report of a recent medical examination (February 24, 2020) indicates that defendant has a Body Mass Index ("BMI") of 47.2 (Exhibit 9 to defendant Supp. Mem.). According to the Centers for Disease Control ("CDC"), people with "severe obesity" have a BMI of 40 or higher. Defendant is severely obese.

[15]   The Centers for Disease Control ("CDC") high risk list includes the following:

- People with chronic lung disease or moderate to severe asthma
- People who have serious heart conditions
- People who are immunocompromised (noting that many conditions can cause a person to be immunocompromised, including cancer treatment, smoking, bone marrow or organ transplantation, immune deficiencies, poorly controlled HIV or AIDS, and prolonged use of corticosteroids and other immune weakening medications)
- People with severe obesity
- People with diabetes
- People with chronic kidney disease undergoing dialysis
- People with liver disease

https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-at-higher-risk.html.

Defendant also cites hypertension as a qualifying medical condition; however, hypertension is not on the CDC high risk list (although pulmonary hypertension is).

nevertheless deny a sentence reduction unless it determines the defendant "is not a danger to the safety of any other person or to the community." USSG § 1B1.13(2). Additionally, this Court must consider the § 3553(a) factors, as "applicable," as part of its analysis. *See* § 3582(c)(1)(A); *United States v. Chambliss*, 948 F.3d 691, 694 (5th Cir. 2020).

Defendant would pose a danger to public safety if released. This Court should deny a sentence reduction on that basis alone. Defendant was convicted of a violent crime in this case (APO while Armed), a crime committed with a gun. He was released from BOP to parole on August 26, 1998. According to the Presentence Report ("PSR") in his Superior Court case, defendant was arrested (twice) just over a year later in Georgia – once for theft by conversion and once for financial identity fraud. On June 1, 2001, defendant was arrested in Gwinnett County, Georgia, and charged with theft by receiving stolen property. He was convicted of this charge as well as the charge of giving a false name/information to a police officer, and he was sentenced to a term of imprisonment (it appears he served 9 months), and a period of probation. According to his Community Supervision Officer in the present case, defendant's adjustment on parole was unsatisfactory. And while he was on parole in this case, defendant shot and grievously wounded Ms. McDaniels as described *supra*. In addition, defendant has a record of misconduct while in prison. Between January 2006 and April 2016 he incurred 11 disciplinary infractions, including assault without serious injury, destruction of property, and disruptive conduct (Attachment H – Inmate Discipline Data). *See United States v. Belle*, 2020 WL 2129412 (D. Conn. May 5, 2020) (notwithstanding asthma, compassionate release denied due to history of violence and firearms offenses); *United States v. Andrews*, 2020 WL 1847861, at *2 (S.D.N.Y. Apr. 10, 2020) (compassionate release denied because violations of supervised release involved shooting in public, showing "extreme disregard for the safety of others").

In addition, the § 3553(a) factors strongly disfavor a sentence reduction. Defendant was convicted of serious offenses. He was an apparent drug dealer who was caught by the police. Confronted by the uniformed police officer, defendant pointed a loaded gun directly at the officer at point-blank range, and he prepared to fire the gun by cocking back the hammer. When the officer

was able to wrestle the gun from defendant, defendant promptly produced another gun, which he also pointed at the officer. This was an extremely dangerous situation. The nature and circumstances of the offense, and the need for the sentence that the Court imposed to reflect the seriousness of the offense, do not favor a sentence reduction. Then, while on parole in this case, defendant committed several offenses, the most serious of which was his senseless shooting and grievously wounding an innocent young woman who was left paralyzed. Defendant plainly has no regard for the law, and releasing him early from his federal sentence will not promote respect for the law. Moreover, releasing defendant early will undermine deterrence to criminal conduct. The public must be protected from further crimes of the defendant. The applicable § 3553(a) factors, taken as a whole, strongly favor against a sentence reduction. BOP has designated defendant a "medium" security classification, and a "medium" for recidivism. (Attachment I - BOP Inmate Profile).[16] Defendant is at the second to highest level for risk of recidivism. Given the violent nature of defendant's offense and his criminal history, reducing defendant's sentence would undermine the goals of sentencing and potentially put the public in danger. These factors militating against a sentence reduction outweigh defendant's asserted medical concerns related to COVID-

---

[16]   BOP is responsible for assigning a recidivism risk level and conducting a needs assessment for all inmates. Prisoners are classified as having a minimum, low, medium, or high risk for recidivism. 18 U.S.C. § 3632(a)(1). Defendant's BOP Inmate Profile (Attachment I) indicates that he is a "medium" risk for recidivism, the second-highest level.

Defendant's security classification is not at the lowest level ("minimum"). His security classification is "medium" (*id.*). Defendant is at a medium security facility. BOP facilities are designated as either minimum, low, medium, high, or administrative. "Medium security FCIs (and USPs designated to house medium security inmates) have strengthened perimeters (often double fences with electronic detection systems), mostly cell-type housing, a wide variety of work and treatment programs, an even higher staff-to-inmate ratio than low security FCIs, and even greater internal controls." https://www.bop.gov/about/facilities/federal_prisons.jsp.

19.[17] *See e.g., United States v. Gotti*, —— F.Supp.3d ——, ——, 2020 WL 497987, at *2 (S.D.N.Y. Jan. 15, 2020) ("The court confronted with a compassionate release motion is still required to consider all the Section 3553(a) factors to the extent they are applicable, and may deny such a motion if, in its discretion, compassionate release is not warranted because Section 3553(a) factors override, in any particular case, what would otherwise be extraordinary and compelling circumstances."). Furthermore, defendant has not established that he would be less vulnerable to COVID-19 if he were released.

      Accordingly, in light of Defendant's record and the totality of relevant circumstances, this Court should deny the motion for a sentence reduction.

## III.   The Court Should Not Consider Defendant's Claim Under D.C. Code § 24-403.04, But if The Court Reaches the Merits, It Should Deny Defendant's Motion.

      Defendant initially filed his claim pursuant to the compassionate release provision in the COVID-19 Emergency Act, now codified at D.C. Code § 22-403.04.  There would be an advantage to defendant if his claim was cognizable under the COVID-19 Emergency Act as there is no exhaustion requirement under that statute. However, defendant has not provided the Court with any authority that supports his claim that this Court has jurisdiction to grant early release under the D.C. Code compassionate release statute. As defendant has pointed out in his supplemental memorandum (at 4), Chief Judge Howell determined in *United States v. Hammond*, Crim. No. 02-294, 2020 WL 1891980 *8 (D.D.C. Apr. 16, 2020), that "the federal compassionate release provision is better read as a procedural mechanism that applies to all sentences imposed by federal courts. Defendant's motion is thus properly filed, and this Court, having imposed a sentence for violations of both the U.S. Code and the D.C. Code, has authority to grant defendant relief under 18 U.S.C. § 3582 as to both." This ruling makes it clear that compassionate release in a federal

---

[17]   Defendant's BOP Inmate Education Data Transcript indicates that he has compiled nearly 2,100 hours of educational programming between March 2004 and September 2019. There are some gaps (e.g., no programming hours listed between February 2012 and January 2015 – nearly three years) (Attachment K – Bureau of Prisons Inmate Education Data Transcript). But on balance this appears to be a factor in defendant's favor; however, this more positive factor does not outweigh the issues of concern discussed herein.

case that also includes a D.C. Code charge should be pursued under the federal statute. The mechanism for defendant to seek relief here is the federal compassionate release statute, not the D.C. statute that was crafted as a counterpart to the federal law to afford relief to District of Columbia prisoners, as opposed to federal prisoners. Hence, *Hammond* provides no support for defendant's claim that this Court may consider his request for early release under the D.C. compassionate release provision.[18]

In any case, should the Court determine that it can consider defendant's petition under the D.C. compassionate release provision, the Court should not grant early release under this statute. Section 305(b) of the COVID-19 Emergency Act provides, in relevant part:

(a)  Notwithstanding any other provision of law, the court may modify a term of imprisonment if it determines the defendant is not a danger to the safety of any other person or the community, pursuant to the factors to be considered in 18 U.S.C. §§ 3142(g) and 3553(a) and evidence of the defendant's rehabilitation while incarcerated, and:

(1)     The defendant has a terminal illness, which means a disease or condition with an end-of-life trajectory;

(2)     The defendant is 60 years of age or older and has served at least 25 years in prison; or

(3)     Other extraordinary and compelling reasons warrant a modification, including:

(A)     A debilitating medical condition involving an incurable, progressive illness, or a debilitating injury from which the defendant will not recover; or

(B)     Elderly age, defined as a defendant who is:

(i)     60 years of age or older;

---

[18]   As the Court is aware, defendants convicted in D.C. Superior Court of felony offenses typically serve the incarceration portion of their sentence in BOP facilities; unlike defendants convicted in federal court, D.C. Superior Court defendants are not eligible for compassionate release under the federal statute. The D.C. compassionate release statute was enacted in part to address this inequity; however, the statute was not intended to provide a defendant convicted in federal court of both federal and D.C. Code offenses with an end run around the exhaustion requirement in the federal compassionate release statute.

(ii)     Has served at least 20 years in prison or has served the greater of 10  years or 75% of their sentence; and

(iii)     Suffers from a chronic or serious medical condition related to the  aging process or that causes an acute vulnerability to severe medical complications or death as a result of COVID-19;

(C)     Death or incapacitation of the family member caregiver of the defendant's children; or

(D)     Incapacitation of a spouse or a domestic partner when the defendant would be the only available caregiver for the spouse or domestic partner.

Defendant has not made the requisite showing under the factors listed in subsections (1) through (3) of the emergency legislation set forth above. He does not have a terminal illness;[19] he is not 60 years of age or older; and he does not meet the "elderly" criteria under the statute. Defendant also has not shown that he has a debilitating medical condition involving an incurable,

---

[19]   Defendant, referencing his COPD, states that he has a terminal illness (Motion at 4, 6). We disagree. The COVID-19 Emergency Act defines a "terminal illness" as "a disease or condition with an end-of-life trajectory," although it does not provide examples. However, the United States Sentencing Commission has issued a policy statement addressing reduction of sentences under 18 U.S.C. § 3582(c)(1)(A), the corresponding federal compassionate release statute. The policy statement includes an application note that specifies the types of medical conditions that qualify as "extraordinary and compelling reasons" warranting a sentence reduction under the statute. As relevant here, examples of a terminal illness (*i.e.*, "a serious and advanced illness with an end of life trajectory") include metastatic solid-tumor cancer, amyotrophic lateral sclerosis (ALS), end-stage organ disease, and advanced dementia. *See* USSG § 1B1.13, Application Note (1)(A)(i). *See also, United States v. Sargent,* 2020 WL 897633 (E.D. Ky. Feb. 24, 2020) (70-year-old inmate's leukemia is not a serious and advanced illness with an end-of-life trajectory; in any event, release would not be warranted in light of violent criminal history); *United States v. Goode*, 2020 WL 58272 (S.D.N.Y. Jan. 6, 2020) (while inmate's kidney disease is incurable, and she receives dialysis, "her disease is treatable, she is responding well to that treatment, and she does not have an 'end of life trajectory.'"); *Cannon v. United States*, 2019 WL 5580233, at *3 (S.D. Ala. Oct. 29, 2019) (the 71-year-old defendant suffers from significant back and stomach issues, as well as high blood pressure, diabetes, skin irritation, loss of hearing, and various other complications, but relief is denied because, *inter alia*, "there is no indication that Cannon is terminally ill").

progressive illness, or a debilitating injury from which he will not recover.[20] At the same time, the government recognizes that the statute uses the word "including" to introduce the factors that constitute "extraordinary and compelling reasons," thus suggesting that the list was intended to be non-exhaustive. Defendant argues that the Court may consider whether the defendant has a medical condition that elevates his risk of becoming seriously ill from COVID-19 in assessing whether the defendant has established an extraordinary and compelling reason under the statute. According to current CDC guidelines, at least two of the conditions that defendant suffers from – diabetes and severe obesity – place a person at increased risk.

Assuming, *arguendo*, that defendant has established "extraordinary and compelling reasons" because he has these two conditions, defendant is nevertheless not entitled to relief. In assessing a request of compassionate release under the COVID-19 Emergency Act, the Court may modify a sentence only if the Court "determines the defendant is not a danger to the safety of any other person or the community, pursuant to the factors to be considered in 18 U.S.C. §§ 3142(g) and 3553(a)" and that there is "evidence of the defendant's rehabilitation while incarcerated." Section 305(a). For the reasons we have discussed *supra* in Section II, the Court should deny defendant's claim under the D.C. statute.

---

[20]   It does not appear that defendant's conditions are debilitating in the sense that he is weak and infirm. He is currently cleared to work and is assigned a work detail in food service (Attachment J – Inmate Summary Reentry Plan – Progress Report). Inmates in the BOP system are classified according to Medical Care Levels. Care levels are determined by the inmate's medical and/or mental health needs and are based primarily on the chronicity, complexity, intensity, and frequency of interventions and services that are required, as well as an inmate's functional capability. According to defendant's BOP Inmate Profile, he is classified at medical Care Level 2 (Attachment I). Care Level 2 inmates are "stable outpatients who require clinician evaluations monthly to every 6 months. Their medical and mental health conditions can be managed through routine, regularly scheduled appointments with clinicians for monitoring. Enhanced medical resources, such as consultation or evaluation by medical specialists, may be required from time to time." https://www.bop.gov/resources/pdfs/care_level_classification_guide.pdf. Examples of such conditions are medication-controlled diabetes, epilepsy, and emphysema. *Id.*

## CONCLUSION

For the reasons cited herein, this Court should deny defendant's motion for a sentence reduction without prejudice for failure to exhaust administrative remedies or, in the alternative, deny the motion on the merits.[21]

Respectfully submitted,

MICHAEL R. SHERWIN
Acting United States Attorney
New York State Bar
Registration Number 4444188


MARGARET J. CHRISS
Assistant United States Attorney
Chief, Special Proceedings Division
D.C. Bar # 452403


By: _____/s/_____
JOHN P. GIDEZ
Assistant United States Attorney
D.C. Bar #332908
555 4th Street, NW
Washington, D.C. 20530
202-252-6752
John.Gidez@usdoj.gov

---

[21]   If the Court decides to grant defendant's motion and order his release, the government requests the Court fashion a sentence that will allow for a 14-day quarantine period and medical clearance prior to defendant's release in order to minimize the possibility of any spread of COVID-19 from defendant to the public. In addition, if the Court grants the motion, the Court may "impose a term of . . . supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment." 18 U.S.C. § 3582(c)(1)(A). The Court may then impose a period of home confinement as a condition of that supervised release, provided that the Court finds that home confinement is a "substitute for imprisonment." U.S.S.G. § 5F1.2; *see* 18 U.S.C. § 3583(d). Alternatively, the Court may consider modifying an existing term of supervised release to add a period of home confinement, consistent with U.S.S.G. § 5F1.2. *See* 18 U.S.C. § 3583(e)(2).

## **CERTIFICATE OF SERVICE**

**I HEREBY CERTIFY** that, on this 8th day of June 2020, I caused a copy of the foregoing Opposition to be electronically filed with the Court and served upon counsel for defendant, Theodore A. Howard, Esq., using the ECF system.

_/s/_____
John P. Gidez
Assistant United States Attorney